# CHARLESTON.

### B. S. HASTINGS v. M. J. MONTGOMERY

Submitted February 26, 1924.     Decided March 11, 1924.

1.  SPECIFIC PERFORMANCE—*To Support Specific Performance Contract Must be Free From Fraud and Mistake and Fair in Terms.*

    To entitle one to a decree for specific performance of a contract for the conveyance of real estate, he must show a valid contract, free from fraud and mistake and fair and equitable in its terms.   (p. 740).

2.  SAME—*Mayor on Refusal of City to Perform Option Cannot Accept and Enforce it for Own Benefit.*

    Where the mayor of a city procures in his own name an option of purchase of a city lot, upon the understanding that it is for the benefit of the city, he can not, upon the city's refusal to exercise the option, accept and enforce it in his own name for his own benefit.   (p. 741).

3.  SAME—*Not Decreed Where Mistake in Description of Land Induced by Optionee.*

    Where a land-owner grants an option of purchase of a city lot under a mistake as to the size of the lot, which mistake

was induced by the optionee, equity will not enforce specific performance thereof if it is shown that the owner would not have granted the option but for such mistake. (p. 741).

Appeal from Circuit Court, Fayette County.

Suit by B. S. Hastings against M. J. Montgomery. From a decree for plaintiff, defendant appeals.

*Reversed, and bill dismissed.*

*V. C. Champe* and *Dillon, Nuckolls & Mahan,* for appellant. *George Love* and *Hubard & Bacon,* for appellee.

MEREDITH, PRESIDENT:

In a suit to compel specific performance by defendant of her contract to convey to plaintiff a business lot in the town of Montgomery, the circuit court of Fayette County decreed for the plaintiff, and defendant appeals.

When the transactions occurred which gave rise to this controversy, plaintiff was mayor of the city of Montgomery, and defendant, the widow of J. C. Montgomery, was a resident of, and the owner of considerable property in the city. J. C. Montgomery died October 28, 1918, and devised to defendant the property here involved. On or about February 4, 1919, plaintiff visited defendant at her home and proposed to her that for a consideration of $2500 she should convey the lot to the city that a city hall might be erected thereon; representing to her that the same proposition had been discussed with her husband, and that the latter had indicated his willingness to make such a sale. It seems that on the 13th of February plaintiff came to defendant again, this time stating that the city council desired a written option as evidence of her agreement to sell at the price named; at any rate, he secured such a writing, executed by defendant, dated February 14, 1919, and it is this option which is the basis of this suit. By the option defendant granted to plaintiff the exclusive right to purchase the property within sixty days from its date, for $2500, and nothing was said in it about the land being used for city purposes. Hastings seeks to enforce the contract, not as a representative of the city, but in his own right, and the circuit court decreed that

upon payment to defendant of the $2500, she should deliver to plaintiff an apt and proper deed for the property, except 8½ feet depth as hereinafter shown.

In her petition for appeal, defendant says she refused to perform the contract because of the misrepresentations with respect to whom the deed was to be made, and as to the dimensions of the lot. From the testimony of those familiar with real estate values in the city it appears that the property was very probably worth more than $2500 at the date of the option. She assigns the following errors in her brief:

1. The court erred in holding that the option was not one for the use and benefit of the city.

2. The court erred in holding that the plaintiff was entitled to have the option contract specifically enforced for his own personal use and benefit.

3. The court erred in holding that the plaintiff had not committed fraud and misrepresentations and that he was entitled to have the option specifically performed even in the modified form, the court thereby making a contract for the parties.

In our view of the matter, the second of these assignments covers the real issues involved, that is, was the plaintiff entitled to have the contract specifically enforced for his own benefit?

Defendant insists and plaintiff admits that when he first made the proposition to defendant on February 4, 1919, he told her that Mr. Montgomery in his lifetime had agreed with him to sell the lot for city purposes for $2500. But plaintiff also says,—and this is an important element of his case—that defendant, in this first interview inquired what the plaintiff would do if the city would not take the property. To this plaintiff says he replied: "If you make an exclusive option to me, I will take it if the city don't." Defendant flatly denies this part of the conversation, and maintains throughout this record that she had no intimation when the bargain was made that plaintiff was acting other than as mayor of the city. She is corroborated in this by the testimony of her daughter, Mrs. Owens, who stated that when plaintiff came for the written option, about the 14th of

February, he told her that he had no personal interest in the proposition.

Having already secured defendant's oral agreement, plaintiff on February 13th, again approached her and requested the written option. He says: "I told her that if she would draw up the option in writing, the council would meet in a short time and I would present it to the council and see if they wanted to buy it." Defendant supplements this by testifying that in this interview she asked plaintiff what the council did as to the purchase of the lot, and that he replied that "They didn't do anything, but laid it on the table to the next meeting," and "there were some of them that wanted the lot up there and some of them there, and asked me if I would give an option, and it was being circulated that it wouldn't be bought—that Luther and Mr. Simms were circulating it."

It is clear from the evidence of either of the parties, therefore, that in order to secure the option, plaintiff used the argument that he wanted a written promise to present to the council for their consideration. Now the fact is that the minutes of the city council, a part of this record, show that the proposition of purchasing a lot for the city building was first taken up by that body on May 7, 1918, at which time, it was voted unanimously that the property owned by M. E. Montgomery, an entirely different property from that of the defendant, "be purchased for town hall." However, at the next meeting, that of June 4, 1918, the motion to purchase the M. E. Montgomery lot was held for further consideration. On February 4, 1919, the day on which plaintiff first took the matter up with defendant, the council met again, and with reference to the lot purchase it was moved and seconded that the proposition pending on the minutes relative to the purchase of the M. E. Montgomery lot be confirmed. Six councilmen voted "aye". Mayor Hastings and two members of a committee of citizens voted in the negative. It must be observed that this action of the council occurred ten days prior to the date, when with representations that he wanted to submit the matter to the council, plaintiff secured the written option from defendant. However, there is evidence in the record that the plaintiff

expressed himself at the time as entertaining hopes of winning over certain members of the council; and he explains that he did not consider the action of the council as necessarily final. Furthermore, on February 7th, plaintiff wrote a letter to the town newspaper in which he expressed himself as opposing the action of the council relative to the town hall location, and as favoring the purchase of property further back from the railroad.

We could not say, therefore, that plaintiff's representations that he was seeking the option for the benefit of the city were untrue. We can say, however, that when he secured the option plaintiff was armed with peculiar knowledge relative to the possibility of the town's purchase of defendant's property, and that he did not make a full disclosure of all of his information to the defendant. He does not even claim that he did so.

There is another point which has given rise to misunderstanding between the parties. In all of the conversation of plaintiff and defendant relative to the sale of the lot, and in the written option, it was described as fronting 40 feet on Fourth Avenue, and running toward the railway 60 feet along Washington street, although at the time when the option was executed, defedant had not had the property measured, and did not know its dimensions. She seems to have relied upon plaintiff's statements that her husband and the plaintiff had measured the lot and ascertained its size. However, they disagree as to what plaintiff stated with reference to the depth of 60 feet. Defendant says that she made it absolutely clear to plaintiff that she was selling at the price fixed only upon the understanding that the depth of 60 feet did not encroach upon either of two structures which stood upon her land, and for which she received a substantial rental. One of these was a two story building on the rear of the lot, and the other a one story building erected between the two story building and Fourth Avenue. She says that plaintiff assured her that a depth of 60 feet would leave these free and clear. She did not care about a small tool house on the front of the lot, and which it was admitted would be taken. Plaintiff testifies to a different understanding; he says in substance that he only represented that the

. 60 feet would not encroach upon the two story building. As a matter of fact, when the lot was later measured, it was ascertained that 60 feet would take the one story building and would extend 8½ feet into the two story one. Admitting that the two story building was by their agreement not to be encroached upon, plaintiff amended his original bill so as to seek specific performance only as to a lot 40 by 51½ feet. The positions of the parties as to this point are plainly irreconcilable.

There is quite a mass of evidence in the record as to the actual value of the property involved as of the date of the option. It appears that at that particular period the town of Montgomery was in the initial stages of a building boom; plans for several factories and business buildings were being formulated, and the paving of several streets had been decided upon. While a few witnesses for plaintiff state that $2500 was not an unfair price for the lot at that time, a large number of others are of opinion that the property was worth more than that. Their estimates range from $3700 to $5000, and we think their testimony is so convincing that it must be accorded considerable respect.

Within the sixty day period specified in the option plaintiff by letter and by tender of the purchase price did all that was necessary to entitle him to a conveyance, provided only, that he was in any event entitled to a conveyance in his own right. At one time defendant had directed her attorney to prepare the proper conveyance, but that seems to have been before the lot was measured and she discovered that one of her buildings was to be taken; and while she understood that the deed was to plaintiff, she testifies that she supposed it was for the benefit of the city.

Plaintiff, as has been stated, testifies to a different understanding as to the taking of the building, and maintains that defendant's objection to conveying to plaintiff as an individual was a mere afterthought, devised to cover her change of mind. He attempts to make out his case for specific performance upon an argument which can be summarized in these words taken from different parts of his brief: The option contract is ''clear and unmistakable in its terms'', and ''There was no taint of fraud and the agreed price was

adequate. It so happened that during the option period and as spring opened up there was one of these unforseen booms, and prices climbed suddenly. Result, the lady exercising her immemorial privilege 'changed her mind', and the option became a 'scrap of paper.' ''

Yet if we should concede much of plaintiff's theory of the case as disclosed by the language just quoted, is he entitled to the relief which he seeks here? It is sufficient only that the contract on its face be unambiguous, that its procurement be free from fraud and that the consideration seem adequate? We do not so construe the law. Specific performance is a remedy so extraordinary that equity is peculiarly careful to see not only that there has been no actual fraud or misrepresentation in the inducement of the contract, but it must appear that the agreement of the parties does not spring even from a mistake on the part of the defendant as to the circumstances of the transaction. And not this alone, for equity is a court of conscience, it looks for itself into the merits of contracts which are brought before it for enforcement, and ''Only those contracts which are fair, just and equitable will be specifically enforced.'' *Crotty* v. *Effler*, 60 W. Va. 258, 54 S. E. 345, See also, *Heflin* v. *Heflin*, 63 W. Va. 29, 59 S. E. 745. Parties must learn the principle that mere proof of the contract does not entitle one to specific performance, that is a matter for the sound discretion of an equity court. This is ably discussed in the following quotation from *Hartigan* v. *Hartigan*, 58 W. Va. 610, 52 S. E. 720:

> ''And in 2d Beach on Mod. Eq. Jur., section 567: 'The relief being discretionary, it follows, therefore, that, in the first place, the contract must, under all circumstances, be equitable and just. An agreement may be valid at law, and there may not be sufficient grounds for its cancellation in equity; and yet, upon a fair and just consideration of the attendant and collateral circumstances, the court will abstain from decreeing its performance. Before granting such a decree the court must be satisfied not only of the existence of a valid contract, free from fraud and enforceable in law, but also of its fairness and of its harmony with equity and good conscience; and any fact showing that a contract

> is unfair, unjust or against good conscience will justify
> a court of equity in refusing to decree its specific per-
> formance.' ''

Applying the doctrine of the decisions above cited and
quoted, we can not believe that the option contract in the
light of all the circumstances could properly be termed a
just, fair and equitable agreement to enforce. The evidence
as already outlined in this opinion shows conclusively to us
that there never was such a free and full discussion of all the
circumstances involved in this transaction as would give
the defendant the advantage of all of the information avail-
able to the plaintiff. She stoutly maintains that she never for
a moment considered the proposition other than as a proposal
to sell to the city. He claims that he gave her to understand
that if the city did not buy the property he would do so.
She claims that it was distinctly understood that the one
story building was not to be taken. Plaintiff claims other-
wise. As to the price, it must be admitted that defendant
was not without knowledge of the contemplated improve-
ments in the town, but she distinctly says that in making the
price of $2500 on her lot, she had it in mind that the erection
of the city building would enhance the value of her other
property nearby.

In Ruling Case Law, Vol. 25, page 241, we find this lan-
guage:

> "The doctrine is well settled that equity will not en-
> force specifically a contract entered into by the defend-
> ant under a mistake, especially when the mistake has
> been produced by the complainant. In such a case
> equity will refuse to lend its aid to compel the specific
> performance of the contract, if it appears that the de-
> fendant would not have entered into it had it not been
> for such mistake.''

To enforce this contract would be to give plaintiff all the
advantage of their misunderstanding. His conduct may not
have been fraudulent, it may not even have been tainted
with fraud, but equity, which endeavors to do complete jus-
tice, will not make it possible for plaintiff to take advantage
of defendant's mistake or misapprehension.

We therefore reverse the decree of the circuit court, and dismiss plaintiff's bill.

*Reversed and bill dismissed.*